# IN THE UNITED STATES DISTRICT COURT

## FOR THE WESTERN DISTRICT OF TEXAS

### AUSTIN DIVISION

| | | |
|---|---|---|
| **JAIME CABALLERO RIOS,** | § | |
| **Petitioner,** | § | |
| | § | |
| **V.** | § | **A-04-CA-497-SS** |
| | § | |
| **NATHANIEL QUARTERMAN,[1]** | § | |
| **Director, Texas Dept. of** | § | |
| **Criminal Justice-Correctional** | § | |
| **Institutions Division,** | § | |
| **Respondent.** | § | |

## REPORT AND RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE

To:     The Honorable Sam Sparks, United States District Judge

The Magistrate Judge submits this Report and Recommendation to the District Court pursuant to 28 U.S.C. §636(b) and Rule 1(e) of Appendix C of the Local Court Rules of the United States District Court for the Western District of Texas, Local Rules for the Assignment of Duties to United States Magistrates, as amended, effective December 1, 2002.

Before the Court are Petitioner's Amended Application for Habeas Corpus under 28 U.S.C. § 2254 (Document 22);Petitioner's Appendices to the Amended Application (Document 23); Respondent's Amended Answer (Document 24); and Petitioner's reply thereto (Document 25).

---

[1] The previous named respondent in this action was Doug Dretke. On June 1, 2006, Nathaniel Quarterman succeeded Dretke as Director of the Texas Department of Criminal Justice, Correctional Institutions Division. Under Rule 25(d)(1) of the Federal Rules of Civil Procedure, Quarterman is automatically substituted as a party.

Petitioner, represented by counsel, has been granted leave to proceed in forma pauperis.[2]  For the reasons set forth below, the undersigned finds that Petitioner's application for writ of habeas corpus should be denied.

## STATEMENT OF THE CASE

### A.    Petitioner's Criminal History

According to Respondent, the Director has lawful and valid custody of Petitioner pursuant to a judgment and sentence of the 274th District Court of Caldwell County, Texas, in cause number 2002-005.  Petitioner was charged with one count of aggravated kidnapping and one count of conspiracy to commit aggravated kidnapping.  After pleading guilty, Petitioner was sentenced to 20 years in prison and a $1,000 fine on the aggravated kidnapping charge and 15 years in prison on the conspiracy to commit aggravated kidnapping.  Petitioner filed a motion for new trial, which was denied.  He did not appeal his convictions.  He did, however, challenge his convictions in a state application for habeas corpus relief.  The state trial court made no findings with regard to the application.  Nevertheless, the state application was denied by the Texas Court of Criminal Appeals without written order on July 28, 2004.  Ex parte Rios, Appl. No. 58,035-01 at cover.

### B.    Factual Background

The factual background of this case is thoroughly explained in Petitioner's amended application for habeas corpus relief.  According to Petitioner, a Caldwell County grand jury indicted Petitioner and four others for intentionally and knowingly abducting Diana Ortega Campos by using,

---

[2]  After filing his original application for habeas corpus relief, Petitioner's retained attorney, Steve Walsh, passed away. This Court subsequently declared Petitioner indigent, appointed Adrienne Urrutia counsel, and ordered new counsel to reply to the State's Answer.  Counsel did so, but also requested and was granted leave to file a re-written and amended application on Petitioner's behalf.

and threatening to use, deadly force.  Id. at 45.  The indictment charged that, in November 2001, the defendants moved Ortega from place to place in an effort to secret her, that they intended to hold her for ransom, and that they intended to terrorize both Ortega and Serafin Campos Hortelano.  Id. at 45-46.  The indictment averred on November 15, 2001, Petitioner called Serafin Campos to demand money for Ortega's release, and on the same day, he instructed two co-defendants, Elias Martinez Perez and Jose Camarillo, to take Ortega outside of Texas.  Id. at 47.  All five defendants pleaded not guilty and proceeded to a joint trial before a jury.

Attorney Mark Clark represented Petitioner and co-defendant Gabriel Infante.  The other co-defendants had individual lawyers.  1 SF 9.  At the August 2002 trial, the State called Serafin Campos Hortelano, an illegal immigrant from Mexico, who testified he had come to the United States illegally many times to work, and that his wife, Diana Ortega, sometimes came with him.  2 SF 86-90.  In October 2002, Hortelano decided to come to the Austin area to work and to have his wife follow later.

Fifteen days later, Hortelano made arrangements with a woman in Reynosa, Mexico, for Ortega to be brought to Texas for $2,000.  2 SF 91-92, 144.  As Hortelano tried to collect the money to pay the fee, Ortega was transported to Houston.  When Hortelano realized he did not have enough money to pay for the trip, he contacted a man he identified as Elias Perez in Houston to explain the situation.  2 SF 93-94.  A few days later, Hortelano met with Perez in Austin.  Perez had Ortega with him.  Hortelano explained he did not have all of the money, and according to Hortelano, Perez became angry.  Perez explained to Hortelano, if he did not have all of the money, he would take Ortega back to Houston.  2 SF 98-99.  Perez apparently became convinced to allow Ortega to go with her husband, but Perez followed the couple to Hortelano's Austin residence, where Perez spent

3

the night in his car, waiting for the remainder of his money.  Hortelano tried for the next two days to get the money, but was unsuccessful.  Perez left Austin but continued to call, insisting he be paid. A few days later, while Hortelano was working on a construction site near Lockhart, Ortega called to say that Perez was at the Austin residence.  Hortelano claimed he could tell that Ortega was frightened.  2 SF 110-11.  Hortelano told his wife to lock herself in the bathroom until he got home. By the time Hortelano arrived, however, Perez and Ortega were gone.  2 SF 112-13.

Hortelano called police, and before they arrived, he also called Perez, demanding that he bring Ortega back because he had the money.  2 SF 116.  Perez declined to bring her back, telling Hortelano she would be at the Houston "office," and he should call there.  2 SF 117.  In a later call, Hortelano spoke to Ortega.  He claimed she sounded scared and that she reported they had "arms," and she discouraged him from coming to try to "defend her."  2 SF 118.

When police arrived, they began monitoring calls between Hortelano, Perez, and others at the Houston number.  On November 18, 2001, with the assistance of police, Hortelano delivered $600 in cash to co-defendant Gabriel Infante, and Ortega was returned.  2 SF 134.  Perez was a passenger in the brown van in which Ortega arrived.  2 SF 135.

Ortega also recounted her version of these events for the jury.  She detailed her trip from Mexico, which included coming across the river on a boat, staying in hotels and houses, and riding on a bus to Houston.  3 SF 18-27.  Ortega understood that her husband would pay the fee for her transportation upon her arrival.  When she got to Houston, Infante picked her up in a white van and took her to the "office."  3 SF 27.  She provided him with her husband's telephone number and he called Hortelano to tell him Ortega was in Houston.  They made arrangements for Hortelano to retrieve Ortega in Houston, but that did not happen.  3 SF 28.  Ortega testified Infante locked her in

4

a downstairs room of the office for a time, until Perez arrived to drive her to Austin.  3 SF 33-34.
She was provided with food and a place to bathe while there.  3 SF 40-42.

Ortega recalled that Perez took her to Austin in a black car.  During the trip, Ortega opened
a box to get a compact disc and saw a green knife in the box.  3 SF 45.  When they arrived at the
meeting place, a grocery store parking lot, Ortega ran to her husband, hugged him and got into his
vehicle.  She saw money change hands, and they drove toward their residence in Austin with Perez
following.  3 SF 49.  Perez slept in his car in their driveway that night.  When Ortega asked why,
Perez explained there was some money missing.  3 SF 50.  She recalled on November 14, 2001, after
Hortelano had gone to work, she heard a car pull up at the residence and Perez approached the door.
She called her husband, who told her to lock herself in.  3 SF 53-54.  She claims, before she could,
Perez was inside of the house.  He told Ortega he wanted his money.  She again called her husband,
and while she was talking, Perez dragged her out of the house by her arm and put her in his car.  3
SF 55-58.  Ortega claimed she struggled with Perez, but he was bigger and stronger.  3 SF 59.  Perez
indicated he had a weapon, and he drove Ortega back to Houston.  3 SF 61-62.

Ortega testified that, once again, she was locked in the Houston office and Infante and Perez
were present.  3 SF 64.  Ortega recalled she saw Petitioner talking on the telephone to Hortelano, and
Petitioner told him if he did not pay the money he owed, Petitioner would take Ortega back to
Mexico.  3 SF 67.  Hortelano then arranged a meeting with Infante and Perez, gave them the money
for Ortega's return, and the men were arrested.

After two days of testimony, four of the five defendants on trial decided to enter guilty pleas.
This included Petitioner.  The trial court admonished the defendants regarding the charges in the
indictment and the maximum punishment for each.  4 SF 6-7.  Petitioner indicated on the record he

understood.  4 SF 7.  The court discussed the fact that defendants could face collateral consequences such as deportation.  4 SF 7-8.  The court then explained the difference between deferred adjudication and regular probation, commenting that "one or more of these gentlemen" would be eligible for deferred adjudication.  4 SF 8.  Petitioner indicated he understood.  4 SF 9.  The court then explained the constitutional rights the defendants were waiving by pleading guilty, including their rights to remain silent, to confront and cross examine witnesses, to counsel and to trial by jury.  All of the defendants indicated they understood and waived these rights.  4 SF 9-14.

The court then discussed the negotiated agreement between the State and the defendants.  It referred to a "plea agreement with a cap," asking whether each lawyer had explained "that cap" to his client.  4 SF 14.  The court commented he would not exceed the agreed-upon cap, and that a pre-sentence investigation would be performed prior to sentencing.  4 SF 15.  The court explained, after the report was completed and both sides presented argument at the sentencing hearing, "we'll be dealing with whether or not you get deferred adjudication or probation and with what conditions." 4 SF 15.  The cap, the court explained, was 30 years confinement on the aggravated kidnapping offense and 15 years confinement on the criminal conspiracy offense.  4 SF 16-17.  Petitioner stated he understood the cap.  4 SF 17.

The court ascertained the signature on the written waiver of rights was Petitioner's, established his mental competency through questioning, and authenticated the written stipulation to the evidence.  4 SF 19-22.  The court stated to Petitioner, "you will be pleading guilty to both counts – ."  Petitioner responded affirmatively.  4 SF 24.  The court then continued to admonish Petitioner and the others concerning whether they were influenced by alcohol or drugs, and whether they had been tricked by anyone into pleading guilty.  4 SF 25.  The court stated the defendants "shouldn't

6

have been promised anything like money to get you to sign this waiver." 4 SF 35-36.  The court then read parts of the waiver of rights to the defendants, pointing out that the court could not sentence them above the sentence negotiated without giving them the opportunity to withdraw their pleas.  The court agin enumerated the constitutional rights waived by the guilty plea, and explained the significance of the stipulated evidence.  4 SF 26-28.  Petitioner indicated he understood, agreed to the stipulated evidence, and verified that his signature appeared on the documents.  4 SF 29, 31, 40-41.  The court warned Petitioner he could be sentenced to up to 30 years imprisonment for the offense of aggravated kidnapping and Petitioner assured the court he wanted to proceed.  4 SF 48.

At the sentencing hearing, Perez, testifying on his own behalf, stated when he went to pick up Ortega in Austin on November 14, 2001, she went with him willingly.  5 SF 69.  He drove her to Houston where they went shopping for clothing at K-Mart.  He stated they hugged and talked throughout the trip.  Perez stated when they were in Houston, Ortega was not locked up.  Rather, she was with him downstairs in the office and was free to use the telephone at any time.  5 SF 70-71.  On cross-examination, Perez elaborated, explaining Ortega had gone with him several places.  He testified he took her sightseeing in Chicago and New York, and during these trips he claimed he and Ortega were romantically involved.  5 SF 79-80.  Perez explained Ortega planned to visit her sister in Dallas, and that Perez and Ortega had discussed moving in together.  5 SF 80.

Petitioner also testified.  He described his transportation business in Houston.  He stated he owned four vans, which he was purchasing on credit, and his business focused on driving people from Houston to other areas of the country.  5 SF 87-89.  Petitioner stated he had no reason to hold Ortega captive, and that he allowed her to go on the trips to New York and Chicago with Perez

because she was "kissing all over him."  5 SF 95.  Under cross-examination, Petitioner would not admit to the kidnapping offense.  5 SF 105, 107.

The probation officer who conducted the pre-sentence investigation acknowledged and expressed concern over the fact the defendants appeared not to accept responsibility for the offenses, despite the fact they had pleaded guilty.  5 SF 130-31.  The probation officer recommended against any type of probation, and the prosecutor requested the court to sentence Petitioner to 30 years in prison.  5 SF 152.  The court then sentenced Petitioner to 20 years in prison on Count 1 and 15 years in prison on Count 2.  5 SF 161.

Petitioner subsequently filed a motion for new trial.  Three months later, a hearing was held on the motion.  Petitioner, represented by new counsel, called his trial attorney, Mark Clark, as a witness.  6 SF 61.  Clark testified that, during the trial, the morning after Ortega had testified, the trial judge summoned the attorneys into his chambers and "made some comments about the suitability of the defendants, based on the evidence he had heard, for probation."  6 SF 71.  In the meeting, the judge acknowledged that the defense to the charges would likely be the romance between Perez and the victim.  6 SF 71.  The court stated, in chambers, that he had not heard any evidence that the defendants had criminal records, and if he did not hear such evidence, they would be eligible for probation.  6 SF 71.  The judge added that he would likely give probation if the defendants "weren't John Dillingers."  6 SF 81.  Clark pointed out to the judge that they were charged with "3g" offenses, meaning the defendants could not "get straight probation from the judge.  They would have to get deferred adjudication."  6 SF 71-72.  The trial judge indicated he understood this, and excused the attorneys to go negotiate with the prosecutor.  6 SF 72.

Clark claimed, after meeting with the prosecutor, he conveyed the 30-year cap offer to Petitioner, explaining he would not be guaranteed deferred adjudication, but that the judge had expressed it as a possibility. 6 SF 73-74. Clark explained to Petitioner that he felt it was probable that Petitioner would get deferred adjudication. 6 SF 75-76. After repeated explanations of the plea bargain, Clark recalled that Petitioner agreed to enter a guilty plea. 6 SF 79. Clark testified that, based on the in camera discussion with the judge, he did not believe his client would receive prison time if he pleaded guilty. Rather, he believed Petitioner would get deferred adjudication. 6 SF 85-86.

Petitioner testified that Clark made it clear that if he pleaded guilty he would "be going free and maybe get deported to Mexico." 6 SF 89. Petitioner explained his lawyer discussed two possible outcomes: getting probation and getting deported. 6 SF 91. Petitioner stated he would have never signed the paper had he thought it was possible he would go to prison. 6 SF 92. Petitioner claimed Clark never explained the waiver of rights or the stipulated evidence to him prior to the plea proceeding. 6 SF 90. He also claimed Clark never told him he could be sent to prison for 30 years.

Infante, one of Petitioner's co-defendants who was also represented by Clark at trial, also testified Clark never informed him that prison was a possibility. 6 SF 101. However, the interpreter during the plea negotiations and plea hearing confirmed Clark's testimony that the defendants were told of the possibility of prison time. 6 SF 109, 113-14. The interpreter also confirmed the prosecutor, during the plea hearing, explained, if things go badly, the defendants could be sent to prison for 30 years. 6 SF 112. The prosecutor was also allowed to testify. He stated at no time did the trial judge say or indicate that he would give the defendants probation or deferred adjudication if they pleaded guilty. 6 SF 115. The prosecutor continued that the judge took great pains to tell the parties he did not know what he was going to do but that he would consider a plea agreement

between the parties if one could be reached.  6 SF 115.  Counsel for Camarillo, the one defendant that continued to trial, noted that Camarillo was found guilty of kidnapping but not conspiracy and was sentenced to ten years probated by the jury.  6 SF 120.  Petitioner's motion for new trial was denied. 6 SF 126.

## C.    Petitioner's Grounds for Relief

Petitioner raises the following grounds for relief:

1.    Petitioner's guilty plea is invalid and unconstitutional;

2.    Trial counsel's deficient performance in misadvising his client concerning the consequences of the plea rendered him constitutionally ineffective;

3.    Trial counsel labored under an actual conflict of interest that rendered him constitutionally ineffective; and

4.    Petitioner is actually innocent of the offenses for which he was convicted. Specifically, Petitioner argues there is abundant evidence in the record demonstrating Ortega and Perez were romantically involved, that she went willingly with him and that she was not kidnapped.  Additionally, Petitioner asserts in the time following the convictions of Petitioner and his co-defendants, Ortega has recanted her claims that she was forcefully taken by Perez.

## D.    Exhaustion of State Court Remedies

Respondent believes Petitioner is also raising a claim that trial counsel failed to move to withdraw Petitioner's guilty plea when Petitioner refused to acknowledge his guilt of the kidnapping. Respondent contends Petitioner has not exhausted his state court remedies with respect to  this claim and his claim of actual innocence.  As such, Respondent argues the claims are procedurally barred.

Petitioner denies making a claim that counsel was ineffective for failing to move to withdraw Petitioner's plea.  However, it appears Petitioner may be attempting to raise a claim in his reply to the Respondent's Answer that the trial court erred in failing to admonish Petitioner of the pitfalls and

risks of having a lawyer who represents two clients in the same case.  A review of the state court records submitted by Respondent shows that Petitioner has properly raised Claims 1-3 in previous state court proceedings.  However, Respondent is correct that Petitioner did not raise the actual innocence claim in his state application for habeas corpus relief.  Petitioner also has not raised a claim that the trial court erred in failing to admonish Petitioner regarding dual representation.  As such, the state court remedies with respect to these claims have not been exhausted.

Before seeking a federal writ of habeas corpus, a state prisoner must exhaust available state remedies, thereby giving the State the opportunity to, " pass upon and correct alleged violations of its prisoners' federal rights." See Baldwin v. Reese, 541 U.S. 27, 29, 124 S. Ct. 1347, 1349 (2004) (citing Duncan v. Henry, 513 U.S. 364, 365, 115 S. Ct. 887, 888 (1995) (per curiam)). To provide the State with the necessary "opportunity," the prisoner must "fairly present" his claim in each appropriate state court, thereby alerting that court to the federal nature of the claim.  Duncan v. Henry, 513 U.S. at 365-366, 115 S. Ct. 887; O'Sullivan v. Boerckel, 526 U.S. 838, 845, 119 S. Ct. 1728 (1999).  The burden is on the petitioner to raise his federal claim in the state courts at a time when state procedural law permits its consideration on the merits, even if the state court could have identified and addressed the federal question without its having been raised.  Bell v. Cone, 543 U.S. 447, 451, 125 S. Ct. 847, 851, n. 3 (2005).

In this case, Petitioner has failed to meet that burden with respect to his actual innocence claim and his trial court error claim.  A subsequent state application for habeas corpus on Petitioner's unexhausted issues would be futile as it would be denied pursuant to TEX. CODE CRIM. PROC. ANN. art. 11.07, § 4 as an abuse of the writ.  When a state court decision rests on a state law ground that is independent of a federal question and adequate to support the judgment, federal courts lack

jurisdiction to review the merits of the case.  Coleman v. Thompson, 501 U.S. 722, 729, 111 S. Ct. 2546, 2553 (1991).  In order for a claim of procedural default to preclude federal review of a habeas petitioner's claim, the last state court issuing a reasoned decision must have clearly and unequivocally relied upon the procedural default as an independent and adequate ground for denying relief.  Harris v. Reed, 489 U.S. 255, 262, 109 S. Ct. 1038, 1043 (1989).   Additionally, even though a claim has not been reviewed by the state courts, this Court may find that claim to be procedurally barred. Coleman, 501 U.S. at 735, 111 S. Ct. at 2557.  The general rule that a state court must explicitly apply a procedural bar to preclude federal review does not apply to those cases where a petitioner has failed to exhaust his state court remedies and the state court to which he would be required to present his unexhausted claims would now find those claims to be procedurally barred.  Id. at n.1. However, a petitioner can still obtain federal habeas review on a claim denied by the state court on the grounds of procedural default if he can show cause and actual prejudice for his procedural default or that a failure to address the merits of the federal claim would result in a miscarriage of justice. Moore v. Roberts, 83 F.3d 699, 702 (5th Cir. 1996), citing Coleman, 501 U.S. at 750, 111 S. Ct. 2565, cert. denied, 519 U.S. 1093, 117 S. Ct. 773 (1997).

Petitioner has failed to show cause and actual prejudice for his procedural default and has made no showing that a failure to address the merits of his unexhausted claims would result in a miscarriage of justice.  Prisoners asserting innocence as a gateway to defaulted claims must establish that, in light of new evidence, "it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt."  Schlup v. Delo, 513 U.S. 298, 327, 115 S. Ct. 851, (1995).  The Schlup standard is demanding and permits review only in the "extraordinary" case.  Id. Petitioner does not meet this standard. As explained below, Petitioner voluntarily admitted his guilt

at trial.  In addition, evidence was presented at trial suggesting the victim was romantically involved

with one of the co-defendants.  The additional evidence presented by Petitioner does little to advance

his actual innocence theory.  Petitioner simply has not demonstrated that more likely than not, in light

of the new evidence, no reasonable juror would find him guilty beyond a reasonable doubt.  Therefore,

Petitioner is barred from raising his unexhausted claims.[3]

## DISCUSSION AND ANALYSIS

A.     **The Antiterrorism and Effective Death Penalty Act of 1996**

On April 24, 1996, the President signed into law the Antiterrorism and Effective Death

Penalty Act of 1996 ["AEDPA"],[4] which radically altered the standard of review by this Court in

federal habeas corpus proceedings filed by state prisoners pursuant to Title 28 U.S.C. § 2254.  Under

the AEDPA's new standard of review, this Court cannot grant Petitioner federal habeas corpus relief

in this cause in connection with any claim that was adjudicated on the merits in state court

proceedings unless the adjudication of that claim either (1) resulted in a decision that was contrary

to, or involved an unreasonable application of, clearly established Federal law, as determined by the

---

[3]To the extent Petitioner is attempting to raise a freestanding innocence claim, his claim fails. In Herrera v. Collins, 506 U.S. 390, 417, 113 S. Ct. 853 (1993), the Supreme Court said in dicta "a truly persuasive demonstration of actual innocence made after trial [in a capital case] would render the execution of a defendant unconstitutional, and warrant federal habeas relief if there were no state avenue open to process such a claim." Recently, the Supreme Court declined to resolve the issue left open in Herrera as to whether freestanding innocence claims are possible. House v. Bell, ___ U.S. ___, 126 S. Ct. 2064, 2087 (2006). Instead, the Court concluded that whatever burden a hypothetical freestanding innocence claim would require, the petitioner had not satisfied it. Id. The Court explained Herrera requires more convincing proof of innocence than Schlup. Because Petitioner has not met the Schlup standard in this case, Petitioner necessarily has not met the Herrera standard. Moreover, Petitioner has not attempted to demonstrate that there are no state avenues open to process his claim.

[4] Pub.L. No. 104-132, 110 Stat. 1214 (1996).

Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable

determination of the facts in light of the evidence presented in the state court proceeding, 28 U.S.C.

§ 2254(d)(1)-(2).

The "contrary to" requirement "refers to the holdings, as opposed to the dicta, of ... [the

Supreme Court's] decisions as of the time of the relevant state-court decision." Dowthitt v. Johnson,

230 F.3d 733, 740 (5th Cir. 2000) (quoting (Terry) Williams v. Taylor, 529 U.S. 362, 120 S. Ct.

1495, 1523 (2000)).    The inquiry into whether the decision was based on an "unreasonable

determination of the facts" constrains a federal court in its habeas review due to the deference it must

accord the state court.    See id.

> Under the "contrary to" clause, a federal habeas court may grant the writ if the state
> court arrives at a conclusion opposite to that reached by ... [the Supreme Court] on
> a question of law or if the state court decides a case differently than ... [the Supreme
> Court] has on a set of materially indistinguishable facts.   Under the "unreasonable
> application" clause, a federal habeas court may grant the writ if the state court
> identifies the correct governing legal principle from ... [the Supreme Court's]
> decisions but unreasonably applies that principle to the facts of the prisoner's case.

Id. at 740-41.

The Fifth Circuit has held that, because a federal habeas court only reviews the reasonableness

of the state court's ultimate decision, the AEDPA inquiry is not altered when state habeas relief is

denied without an opinion. Schaetzle v. Cockrell, 343 F.3d 440, 443 (5th Cir. 2003) (citing Santellan

v. Cockrell, 271 F.3d 190, 193 (5th Cir. 2001), cert. denied, 535 U.S. 982, 122 S. Ct. 1463 (2002);

Neal v. Puckett, 286 F.3d 230, 246 (5th Cir. 2002) (en banc) ("It seems clear to us that a federal

habeas court is authorized by 2254(d) to review only a state court's 'decision,' and not the written

opinion explaining that decision."), cert. denied, 537 U.S. 1104, 123 S. Ct. 963 (2003)).  With these

principles in mind, this Court must now turn to the issues raised by the pleadings in this cause.

**B.     Involuntary Plea**

Petitioner contends his guilty plea is invalid and unconstitutional.  A federal court will uphold a guilty plea challenged in a habeas corpus proceeding if the plea was knowing, voluntary, and intelligent. See James v. Cain, 56 F.3d 662, 666 (5th Cir. 1995); and Hobbs v. Blackburn, 752 F.2d 1079, 1081 (5th Cir. 1985), cert. denied, 474 U.S. 838 (1985).  For a guilty plea to be "intelligently" and "knowingly" entered, the defendant must understand both the true nature of the charge against him, and "the consequences" of a guilty plea, respectively.   United States v. Briggs, 939 F.2d 222, 227 (5th Cir. 1991) and United States v. Pearson, 910 F.2d 221, 223 (5th Cir. 1990), cert. denied, 498 U.S. 1093 (1991).  A plea is intelligent if the defendant understood the nature and substance of the charges against him and not necessarily whether he understood their technical legal effect. James v. Cain, 56 F.3d at 666 (citing Taylor v. Whitley, 933 F.2d 325, 329 (5th Cir. 1991), cert. denied, 503 U.S. 988 (1992)).

At the plea hearing, Petitioner, along with three of his co-defendants, were admonished the first degree felony for which had have been charged was punishable by imprisonment for life or for any term of not more than 99 years or less than five years.  4 SF 6.  They were also admonished the second degree felony for which they had been charged was punishable by imprisonment for any term of not more than 20 years or less than two years.  4 SF 6.  They were warned for both offenses they could also be fined no more than $10,000.00.  4 SF 6.  Petitioner and his co-defendants were also warned they could be deported.  4 SF 8.  The trial court mentioned one or more of the defendants may be eligible for deferred adjudication, but he did not promise any of the defendants they would get deferred adjudication.  4 SF 8.  He explained the probation department would do a background investigation, which he would consider, along with the State's evidence and the defendants' evidence

before sentencing the defendants pursuant to the plea agreement.  4 SF 15, 50.  He stated he would decide "whether or not you get deferred adjudication or probation and with what conditions."  4 SF 15 (emphasis added).  The trial court painstakingly described all of the rights the defendants would be giving up if they decided to plead guilty.  4 SF 10-14, 22-23.  In addition, the trial court explained the plea bargain agreement in detail.  4 SF 15.  The trial court explained the State in exchange for Petitioner's guilty plea to Court 1 would recommend a cap agreement with no greater punishment than 30 years confinement and a fine of $1,000.00.  4 SF 16.  With respect to Count 2 the State would recommend a cap agreement with no greater punishment than 15 years confinement and a fine of $1,000.00.  4 SF 16-17.  Petitioner indicated he understood the cap and the rights he was giving up.  4 SF 17, 29.  The trial court then delved into whether Petitioner and his co-defendants were mentally competent.  4 SF 19.  The court concluded the defendants were pleading knowingly, intelligently and voluntarily.  4 SF 23-25.  The court also confirmed with the interpreter that the defendants understood.  4 SF 31.  The prosecutor then asked the defendants whether they were satisfied with the work their lawyers had done in the case.  4 SF 45.  The prosecutor noted Petitioner had two attorneys.  4 SF 45.  Petitioner responded he was very pleased with both lawyers.  4 SF 45. The prosecutor confirmed that Petitioner understood that, "if things go badly for him" in the aggravated kidnapping count in his case, he could serve 30 years in a Texas prison and be required to serve every day of his sentence.  4 SF 48.  The prosecutor further confirmed that Petitioner understood that, "if things go badly for him" in the conspiracy count, he could be sentenced to 15 years in prison and be required to serve every day of the sentence.  4 SF 48.  Petitioner responded he still wanted to plead guilty.  4 SF 48.

16

After being sentenced to 20 years in prison on the aggravated kidnapping count and 15 years in prison on the conspiracy count, Petitioner filed a motion for new trial.  Trial counsel testified he let Petitioner know what the 30-year cap recommendation meant.  6 SF 73.  He stated he was sure he told Petitioner he was not guaranteed probation or deferred adjudication.  6 SF 73.  Counsel also informed Petitioner that if he had no prior criminal record he would be "eligible" for probation.  6 SF 73.  Counsel was under the impression that probation was a possibility and probability.  6 SF 75. Counsel denied he told Petitioner that if he pleaded guilty he would get probation from the judge. 6 SF 76.  Counsel admits he informed Petitioner his opinion about probation could be wrong and he might get prison time pursuant to the caps.  6 SF 76.   He made sure Petitioner knew his opinion might be wrong about the probation issue.  6 SF 77.  Counsel admits Petitioner understood there was a risk in pleading guilty and he might be sentenced to the full prison sentence.  6 SF 77.  He states he went over the risks four times with Petitioner and made sure Petitioner knew he had to make up his own mind.  6 SF 77-78.  Counsel testified an interpreter was present during the discussion and he was sure Petitioner knew pleading guilty was a risk and he might not get probation and could possibly be sentenced to prison up to the caps.  6 SF 78, 80, 82-83.

Petitioner also testified at the hearing on the motion for new trial.  Petitioner stated he would not have signed the plea papers if he had known he could receive up to 30 years in prison.  6 SF 92. He claimed the interpreter just kept telling Petitioner and co-defendants during the plea hearing that "it was just paperwork."  6 SF 94.  Petitioner admitted no one made any promises about his sentence. 6 SF 95.  However, he stated he believed the only two outcomes from pleading guilty were probation or deportation.  6 SF 95.  He denied that his attorney told him he could be sent to prison for 30 years and could not remember the prosecutor warning him during the plea hearing that if things go badly

for him he could be sent to prison for 30 years.  6 SF 99, 104.  Petitioner implies the interpreter failed to interpret everything for him.

The interpreter from the plea hearing also testified.  He stated he accurately interpreted word-for-word in the Spanish language for Petitioner.  6 SF 109.  He testified he made sure Petitioner understood by asking every two or three statements whether he fully understood what was being said.  6 SF 109.  The interpreter testified further that he interpreted the plea documents word-for-word from English to Spanish.  6 SF 110-11.  He also recalled the prosecutor warning Petitioner if things go badly for him he could be sentenced to 30 years in prison.  6 SF 112.  The interpreter testified he accurately translated word-for-word during the plea hearing and made sure Petitioner understood what he was saying.  6 SF 112.  He also confirmed that counsel warned Petitioner he could possibly go to prison for 30 years if he pleaded guilty.  6 SF 113.

The prosecutor also testified at the hearing on the motion for new trial.  He testified he was present during the chambers discussion regarding plea negotiations.  6 SF 114-15.  He stated the trial judge did not say or indicate he would give the defendants probation or deferred adjudication if they pleaded guilty.  6 SF 115.  According to the prosecutor, the judge took great pains to tell those present that he did not know what he was going to do, but he would consider a plea agreement between the parties if one could be reached.  6 SF 115.

The trial judge was the same judge, who conducted the motion for new trial hearing.  Although he did not explain his decision, he denied Petitioner's motion for new trial in which Petitioner claimed his plea was involuntary because his counsel promised he would receive deferred adjudication.  6 SF 126.  By denying the motion for new trial, the state court implicitly made a

credibility choice that trial counsel did not induce Petitioner to plead guilty and that Petitioner's guilty plea was voluntary. This Court is not at liberty to second guess the state court's credibility choices.

Petitioner has not presented this Court with any credible evidence establishing that his plea was involuntary or unknowingly entered. Although he mistakenly believed he would receive deferred adjudication or probation, the record makes clear he was informed many times by counsel, the prosecutor and the trial court that he could be sentenced to 30 years in prison, and the interpreter confirmed Petitioner was aware of this fact.

Having independently reviewed the entire state court record, this Court finds nothing unreasonable in the state court's application of clearly established federal law or in the state court's determination of facts in light of the evidence. Accordingly, Petitioner's claim does not warrant federal habeas relief.

## C.    Ineffective Assistance of Counsel

Petitioner also argues he was denied effective assistance of counsel in that trial counsel misadvised him concerning the consequences of his plea and labored under an actual conflict of interest. Petitioner raised these same issues in his state application for habeas corpus relief. The state court rejected the merits of Petitioner's claim. As such, the AEDPA limits the scope of this Court's review to determining whether the adjudication of Petitioner's claim by the state court either (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.

Ineffective assistance of counsel claims are analyzed under the well-settled standard set forth

in Strickland v. Washington, 466 U.S. 668, 104 S. Ct. 2052, 80 L.Ed.2d 674 (1984):

> First, the defendant must show that counsel's performance was deficient. This
> requires showing that counsel made errors so serious that counsel was not functioning
> as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the
> defendant must show that the deficient performance prejudiced the defense. This
> requires showing that counsel's errors were so serious as to deprive the defendant of
> a fair trial, a trial whose result is reliable. Unless a defendant can make both
> showings, it cannot be said that the conviction or death sentence resulted from a
> breakdown in the adversary process that renders the result unreliable.

Id. at 687, 104 S. Ct. at 2064. In deciding whether counsel's performance was deficient, the Court

applies a standard of objective reasonableness, keeping in mind that judicial scrutiny of counsel's

performance must be highly deferential. Id. at 686-689, 104 S. Ct. 2064-65. "A fair assessment of

attorney performance requires that every effort be made to eliminate the distorting effects of

hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the

conduct from counsel's perspective at the time." Id. at 689, 104 S. Ct. at 2065. "Because of the

difficulties inherent in making the evaluation, a court must indulge a strong presumption that

counsel's conduct falls within the wide range of reasonable professional assistance; that is, the

defendant must overcome the presumption that, under the circumstances, the challenged action might

be considered sound trial strategy." Id. (Citation omitted). Ultimately, the focus of inquiry must be

on the fundamental fairness of the proceedings whose result is being challenged. Id. at 695-97, 104

S. Ct. at 2069. Accordingly, in order to prevail on a claim of ineffective assistance of counsel, a

convicted defendant must show that (1) counsel's representation fell below an objective standard of

reasonableness, and (2) there is a reasonable probability that, but for counsel's unprofessional errors,

the result of the proceeding would have been different. Id. at 687, 104 S. Ct. at 2064.

In the context of a guilty plea, a petitioner must show "that there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." Hill v. Lockhart, 474 U.S. 52, 59, 106 S. Ct. 366, 370 (1985). "[O]nce a guilty plea has been entered, all non-jurisdictional defects in the proceedings against a defendant are waived.  This includes all claims of ineffective assistance of counsel, except insofar as the alleged ineffectiveness relates to the voluntariness of the giving of the guilty plea." Smith v. Estelle, 711 F.2d 677, 682 (5th Cir. 1983), cert. denied sub. nom, Smith v. McKaskle, 466 U.S. 906, 104 S. Ct. 1685 (1984).

Petitioner's ground for relief that counsel misadvised him regarding the consequences of his plea is without merit.  As discussed above, the record reflects Petitioner was fully admonished, in writing and in open court, regarding the nature of the charges against him, his rights in the criminal process and the consequences of his guilty plea.  The state court's determination that counsel did not provide ineffective assistance of counsel was not an unreasonable application of clearly established federal law.

Petitioner also argues trial counsel labored under an actual conflict of interest stemming from his dual representation of Petitioner and co-defendant Infante. Petitioner indicates counsel should have emphasized Infante's active participation in the alleged kidnapping and portrayed Petitioner as merely an unknowing presence.  On behalf of Infante, Petitioner suggests counsel should have argued Petitioner was the boss and Infante was just an unwitting employee.  Petitioner explains counsel was unable to draw distinctions in his clients' roles, because the State could have used the defense's approach against the other client.  Petitioner contends counsel refrained from placing the blame on Infante, thereby highlighting his alleged role.  Petitioner maintains counsel recognized this conflict and induced the defendants to plead guilty to extract himself from the conflicted position.

21

Citing <u>Barrientos v. United States</u>, 668 F.2d 838, 841 (5th Cir. 1982), Respondent contends Petitioner's guilty plea waived this claim. Additionally, he argues, because Petitioner and Infante pleaded guilty to the charges at the same time, there is no actual conflict of interest that affected counsel's performance.

Petitioner distinguishes <u>Barrientos</u> from this case. He argues the attorney in <u>Barrientos</u> disclosed the dual representation matter to his client and the client chose to waive the conflict and proceed with the guilty plea. In his case, he asserts he never received any such explanation or disclosure, nor did he have an opportunity to waive the conflict. Additionally, he argues the defendant in <u>Barrientos</u> alleged a mere potential conflict arising from dual representation, whereas Petitioner has demonstrated an actual conflict existed.

The role of this Court is to determine whether or not the Texas Court of Criminal Appeals' decision involved an unreasonable application of clearly established Federal law to the facts of Petitioner's case. The leading federal case is <u>Cuyler v. Sullivan</u>, 446 U.S. 335, 345-46, 100 S. Ct. 1708 (1980). In <u>Cuyler,</u> the United States Supreme Court held that a party who raised no objection at trial may obtain habeas corpus relief by demonstrating that his counsel represented conflicting interests and that an actual conflict of interest adversely affected his lawyer's performance. Such representation constitutes ineffective assistance of counsel and violates the Sixth Amendment. Although no prejudice need be shown if an actual conflict of interest is found to exist, the petitioner must demonstrate that the conflict is actual, not speculative. <u>Id.</u> at 348.

The Court in <u>Cuyler</u> held that trial courts are not required to initiate inquiries into the propriety of multiple representation in every case, as defense counsel have ethical obligations to avoid conflicting representation. <u>Id.</u> at 346-47. Therefore, when no objection is made, and "absent special

22

circumstances," the courts may assume that either the representation entails no conflict or that the lawyer and his clients knowingly accept such risk of conflict as may exist.  Id. See also United States v. Placente, 81 F.3d 555, 559 (5th Cir.1996) (when no objection is made at trial, defendant must show that an actual conflict of interest adversely affected counsel's performance); Perillo v. Johnson, 205 F.3d 775, 781 (5th Cir. 2000) (defendant must prove attorney was "compelled to compromise his or her duty of loyalty or zealous advocacy to the accused by choosing between or blending the divergent or competing interest of a former or current client.").

"An actual conflict exists if 'counsel's introduction of probative evidence or plausible arguments that would significantly benefit one defendant would damage the defense of another defendant whom the same counsel is representing.'"  United States v. Lyons, 703 F.2d 815, 820-21 (5th Cir. 1983) (quoting Baty v. Balkcom, 661 F.2d 391, 395 (5th Cir. 1981), cert. denied, 456 U.S. 1011, 102 S. Ct. 2307 (1982)).  Petitioner's claim of actual conflict rests on his assertion that had he continued with trial he would have gained substantially if his lawyer were willing to emphasize Infante's active participation and to portray Petitioner's role as merely an unknowing presence. However, in Petitioner's case, Infante and Petitioner chose to plead guilty prior to the end of the trial and prior to the development of an actual conflict.  Counsel's defense theory was that the victim consented to the travel because of her romantic involvement with one of the co-defendants.  This consent theory was beneficial to both Petitioner and Infante and did not pose an actual conflict. Therefore, at the time of their decision to plead guilty, there was merely a potential that a conflict of interest could arise.  See Stevenson v. Newsome, 774 F.2d 1558, 1561 (11th Cir. 1985), cert. denied, 475 U.S. 1089-90 (1986) ("It must be demonstrated that the attorney 'made a choice between possible alternative courses of action' . . . If he did not make such a choice, the conflict remained

hypothetical."). Because Petitioner and Infante both pleaded guilty at the same time, there was no significant divergency of interests between the two nor was there a situation where "one defendant stands to gain significantly by counsel adducing probative evidence or advancing plausible arguments that are damaging to the cause of a co-defendant whom counsel is also representing." Ramirez v. Dretke, 396 F.3d 646, 650 (5th Cir. 2005). For these reasons, this Court finds nothing unreasonable in the state court's application of clearly established federal law or in the state court's determination of facts in light of the evidence regarding Petitioner's conflict of interest claim. Accordingly, the Court is of the opinion that 28 U.S.C. § 2254, as amended by the AEDPA, bars habeas corpus relief on Petitioner's claim that he received ineffective assistance of trial counsel.

## RECOMMENDATION

It is recommended that Petitioner's application for writ of habeas corpus be denied.

## OBJECTIONS

The parties may file objections to this Report and Recommendation. A party filing objections must specifically identify those findings or recommendations to which objections are being made. The District Court need not consider frivolous, conclusive, or general objections. Battles v. United States Parole Comm'n, 834 F.2d 419, 421 (5th Cir. 1987).

A party's failure to file written objections to the proposed findings and recommendations contained in this Report within ten (10) days after the party is served with a copy of the Report shall bar that party from de novo review by the district court of the proposed findings and recommendations in the Report and, except upon grounds of plain error, shall bar the party from appellate review of unobjected-to proposed factual findings and legal conclusions accepted by the

district court.  See 28 U.S.C. § 636(b)(1)(C);  Thomas v. Arn, 474 U.S. 140, 150-153, 106 S. Ct. 466, 472-74 (1985); Douglass v. United Servs. Auto. Assoc., 79 F.3d 1415 (5th Cir. 1996)(en banc).

The Clerk is directed to send a copy of this Report and Recommendation to the parties by certified mail, return receipt requested.

SIGNED this 5th day of July, 2006.

_____

ANDREW W. AUSTIN
UNITED STATES MAGISTRATE JUDGE